FILED
SEP 03 2019
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY ___ DEPUTY CLERK

# UNITED STATES DISTRICT COURT

for the

Western District of Texas

Waco Division

| | | |
|---|---|---|
| Sheila Denise Kendricks<br>*Plaintiff(s)*<br>*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*<br>**-v-**<br><br>See Attached<br>*Defendant(s)*<br>*(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | ) | Case No. W19CA518<br>*(to be filled in by the Clerk's Office)*<br><br>Jury Trial: *(check one)* ☒ Yes ☐ No |

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

### I. The Parties to This Complaint

#### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Sheila Denise Kendricks |
| Street Address | 936 Parkview Circle |
| City and County | Hewitt/McLennan |
| State and Zip Code | Texas 76643 |
| Telephone Number | (254) 495-6787 |
| E-mail Address | sheila kendricks@yahoo.com |

#### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Methodist Children's Home |
| Job or Title *(if known)* | Religious Charitable Organization |
| Street Address | 1111 Herring Avenue |
| City and County | Waco/McLennan |
| State and Zip Code | Texas 76708 |
| Telephone Number | (254) 753-0181 |
| E-mail Address *(if known)* | |

Defendant No. 2

| | |
|---|---|
| Name | Julie Spiech |
| Job or Title *(if known)* | Associate Administrator |
| Street Address | 1111 Herring Avenue |
| City and County | Waco/McLennan |
| State and Zip Code | Texas 76708 |
| Telephone Number | (254) 753-0181 |
| E-mail Address *(if known)* | jspeich@mch.org |

Defendant No. 3

| | |
|---|---|
| Name | Judy Broadway |
| Job or Title *(if known)* | Methodist Children's Home Vice President Hunam Resources |
| Street Address | 1111 Herring Avenue |
| City and County | Waco/McLennan |
| State and Zip Code | Texas 76708 |
| Telephone Number | (254) 753-0181 |
| E-mail Address *(if known)* | jbroadway@mch.org |

Defendant No. 4

| | |
|---|---|
| Name | Moe Dozier |
| Job or Title *(if known)* | Methodist Children's Home Vice President Residential Programs |
| Street Address | 1111 Herring Avenue |
| City and County | Waco/McLennan |
| State and Zip Code | Texas 76708 |
| Telephone Number | (254) 753-0181 |
| E-mail Address *(if known)* | mdozier@mch.org |

**C. Place of Employment**

The address at which I sought employment or was employed by the defendant(s) is

| | |
|---|---|
| Name | Methodist Children's Home |
| Street Address | 1111 Herring Avenue |
| City and County | Waco/McLennan |
| State and Zip Code | Texas 76708 |
| Telephone Number | (254) 753-0181 |

## II. Basis for Jurisdiction

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☒ Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note: In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☒ Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note: In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☒ Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note: In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☒ Other federal law *(specify the federal law)*:

Whistleblower Protection

☒ Relevant state law *(specify, if known)*:

Chapter 21 of the Texas Labor Law

☐ Relevant city or county law *(specify, if known)*:

## III. Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A. The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

- ☐ Failure to hire me.
- ☒ Termination of my employment.
- ☒ Failure to promote me.
- ☒ Failure to accommodate my disability.
- ☒ Unequal terms and conditions of my employment.
- ☒ Retaliation.
- ☐ Other acts *(specify)*: ______

*(Note: Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B. It is my best recollection that the alleged discriminatory acts occurred on date(s)

9/8/2015; 5/31/2018; 7/13/18

C. I believe that defendant(s) *(check one)*:

- ☐ is/are still committing these acts against me.
- ☒ is/are not still committing these acts against me.

D. Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

- ☒ race African American
- ☐ color ______
- ☐ gender/sex ______
- ☐ religion ______
- ☐ national origin ______
- ☒ age *(year of birth)* 1971 *(only when asserting a claim of age discrimination.)*
- ☒ disability or perceived disability *(specify disability)*

  Chronic Illness/Major Surgery

E. The facts of my case are as follows. Attach additional pages if needed.

See Exhibit "A"

*(Note: As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

## IV. Exhaustion of Federal Administrative Remedies

A. It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*

On 4/2/19 to the EEOC and TWC Civil Rights Division on 8/3/18.

B. The Equal Employment Opportunity Commission *(check one)*:

☐ has not issued a Notice of Right to Sue letter.

☒ issued a Notice of Right to Sue letter, which I received on *(date)* 8/16/19 .

*(Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C. Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

☒ 60 days or more have elapsed.

☐ less than 60 days have elapsed.

## V. Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

I am praying for this Honorable Court to order an award of $1,145,500 for the following: 1) Back Pay and Front Pay at the Associate Administrator salary at MCH, compounded by a 3% annual raise, to equal $375,500; 2) Paid Time Off, Holiday Pay, Health Coverage, Retirement Match, Dental and Vision Benefits as additional compensation for the same five years of, Back Pay and Front Pay, to total $70,000; 3) $200,000 for the violation of federal and/or state laws; 4) $75,000 for retaliation; 5) $75,000 for Physical and Emotional Harm; and 6) Punitive Pay in the amount of $350,000. Additionally, I am asking to be compensated for all attorney fees, professional and witness testimony fees, legal fees, court costs and the recover of any other monies expended to resolve this matter. I am diagnosed with a chronic illness that is only controlled by infusion treatments that I receive every six weeks. If I do not receive my treatments, my health will decline, and it is not unrealistic that I would not be able to work and take care of myself. Lastly, I am seeking an injunctive relief by the employment termination of each MCH employee, and Defendant, found to have willfully engaged in egregious actions. I ask this to protect MCH from further liability of this nature. The MCH Board of Directors lack of leadership and appropriate response to this matter suggests that such willful actions are sure to continue, and more individuals will be damaged as I have been, thus harming MCH. MCH is a charitable organization, a Christian ministry, and the acts that I have documented in this complaint goes against the purpose in which this entity was organized for.

## VI. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 9-3-19

Signature of Plaintiff

Printed Name of Plaintiff Sheila D. Kendricks

### B. For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

Street Address ______

State and Zip Code ______

Telephone Number ______

E-mail Address ______

Page 7 of 7

# ATTACHMENT

Defendants:
Methodist Children's Home
Julie Spiech, Associate Administrator
Mark Dozier, Vice-President of Residential Programs
Judy Broadway, Vice-President of Human Resources

EEOC Form 161-B (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

# NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To: **Sheila D. Kendricks**
**936 Parkview Circle**
**Hewitt, TX 76643**

From: **Dallas District Office**
**207 S. Houston St.**
**3rd Floor**
**Dallas, TX 75202**

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **31C-2019-00088** | **Tammy R. Johnson, Enforcement Supervisor** | **(214) 253-2874** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[X] More than 180 days have passed since the filing of this charge.

[ ] Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X] The EEOC is terminating its processing of this charge.

[ ] The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[X] The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ] The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Belinda F. McCallister [signature]

**Belinda F. McCallister,**
**District Director**

8/14/19
*(Date Mailed)*

Enclosures(s)

cc:

**John Hawkins**
**NAMAN HOWELL SMITH & LEE, PLLC**
**400 Austin Avenue, Ste. 800**
**Waco, TX 76703**
**METHODIST CHILDREN'S HOME**

**Exhibit A**

On February 12, 2007, I was hired as a unit manager at the Methodist Children's Home (MCH). I was able to grow in this position as evidenced by my above average Annual Performance Evaluations, and the fact that I never received any negative discipline in my career at MCH, until eight days after I filed grievances for the first time on July 3, 2018. Prior to MCH, I had previous experience working with adolescents in an acute setting, and I was recommended for this position at MCH, by two child psychiatrists and another professional, who had a long-term career working with youth in this same organization. I had extensive experience providing individual, group and family therapies; crisis management; clinical assessments, treatment planning; and collaborating with other professionals, among other duties. At MCH, I had the opportunity to be supervised by and learn from a tenured administrator that helped to develop the Structured Program and train professional staff who worked as leaders in the structured units at MCH.

Also, I had the opportunity to be trained on the Trust Based Relational Intervention (TBRI), by Dr. Karen Purvis herself, the founder of this groundbreaking program. Additionally, I was trained by individuals that Dr. Purvis herself trained in this modality that is widely known and used in organizations that serve children and youth. My education, experience and training prepared me to lead a team of shift work staff in a girls' structured unit that I was assigned to. My staff and I developed rapport and cohesion and we all worked together to create a therapeutic milieu. Our residents responded well to our efforts, and thus they increased in their knowledge and demonstrated skills at a high level, where they lived together in a family like setting showing responsible behaviors. Our residents connected well to each other from the work that my team and I did with them. This work made it possible for our residents to meet their daily responsibilities with oversight and minimal assistance. This was not an easy achievement to accomplish with a group of female adolescents with emotional and behavioral issues. However, I did it with the help of my supervisor, my team, and other professionals from MCH. My efforts were formally recognized on February 12, 2012, when I received a staff award for Service, one of the Core Values of MCH. Here is an excerpt from the MCH Sunshine Magazine regarding this recognition, "Sheila took on the arduous task of running two home units for several months, putting in countless hours to ensure that the staff and youth were cared for." It was also mentioned in this same write up that both homes "flourished."

Then, soon after I received this award, I was informed that my unit was not in a livable condition, and my team of staff and residents were dispersed to different units on campus. I was assigned to worked in a boys' basic home with home parent staff. This unit was well managed, making it easy for me to transition into my new role while being supervised by the same administrator. In this unit, I was assigned a male resident that was diagnosed with renal failure. Although MCH had a clinic on campus, with nurses, I was chosen to take care of the medical needs of this resident. I was not a medical social worker, therefore I had to read, study, watch videos, and consult with professionals who served patients with renal failure to provide effective care to my resident. I was tasked with ensuring that my staff of home parents were also able to provide good care to him. The care that my resident required meant that modifications had to be made to some of the services that he received from staff in other departments. This too was my responsibility. It was important that I helped to ensure that his programming from other

departments were specific to his needs and did not compromise his declining health. I had to remain abreast of his needs and care as I was the professional on campus that was contacted regularly regarding his care, programming, and needs.

Also, I worked with professionals in the medical field to successfully arrange for my resident to receive dialysis and to be placed on a kidney transplant list. It was necessary for my resident to arrive on time to his dialysis center that was an hour away, three times a week, and scheduled to occur in the early morning. A lot of planning and coordination was needed to make this happen. It was done without any problems. Since my resident lived in New Mexico, before he would go home for visits, it was imperative for me to provide education on his needs to his family, and especially prepare them on what to do if the call for a kidney transplant came while he was at home with them. Of course, dialysis in his home state of New Mexico had to be set up, and his caregivers, who were his grandparents, needed a lot of support that I provided to them. My responsibilities for my resident sometimes necessitated me being available as needed when I was off duty. I had developed a close relationship with my resident, and because of his medical situation, I allowed him to text me when I was off duty with guidelines that he followed.

In continuing, at some point, I had to admit my resident into the hospital to receive a catheter in his heart. He was released from the hospital, back to my unit, with this catheter that could not get wet per his medical provider. I had to remain calm and keep my staff and others calm while we took care of our resident in a unit that was not medically equipped. We did it. Simultaneously, I was helping my resident with his depression and anger over his medical diagnosis, family and peer issues, in addition to securing benefits that he was eligible to receive, etc. While he was on the list for a kidney transplant, I was the designated person to receive the call, transport him to San Antonio, TX, and stay with him throughout this process. My life was significantly impacted by the care that my resident needed, yet, I served my resident and MCH gratefully. I had a bag packed with my belongings and notified my family to not be alarmed if I had to leave suddenly because it would be to take care of a vital need for one of my residents. Unfortunately, my resident's health declined and per doctor's order, my staff and I had to keep a defibrillator on hand in case it needed to be used to treat my resident. This was an emotional assignment for all involved. I had to remain calm as others watched me closely, and if I had not remained calm, this situation could have been made worse. I remained composed and worked to help my residents, staff, and others maintain mood regulation. In addition to the care that I provided to this resident, I still had a unit to manage and services to provide for my other residents. I had to be a quick learner, resourceful, have a balanced life, and multitask to meet the demands placed on me. I met each challenge with the support of my administrator, colleagues, staff and others at MCH. My unit thrived despite the heavy load that I had.

Next, in the summer of 2014, I believe it was, I was moved to another girls' structured unit. This unit was completely out of control. I had to focus on safety issues while I started teaching the shift work staff and students the basics of group living in a homelike setting. The students were engaging in physical aggression, threatening staff, using foul language, refusing to clean, and had become accustomed to not following rules or guidelines. I had to develop connections with the staff and residents, while at the same time, teach and hold them accountable to the change process. This was no easy task, but I did it. It took long hours and a lot of hard work to get the unit to a safe and therapeutic environment. The harder I worked, the more I was used to serve

adolescents with difficult behaviors that did not meet the admission criteria, but I believe was being accepted as the bed utilization count was low. It became routine for me to be assigned female residents who were released back to MCH from a psychiatric hospital and who showed challenging behaviors. My team of staff and I were effective in the care that we provided. In humility, and for the purpose of this matter, unlike in other units, I must report that my staff and I did not have major issues like substance abuse, fire setting, impregnation, run away, and the selling of illegal drugs on campus. Further, I was approved to become an administrator on call to meet the needs of the ministry after hours and on weekends. I had served in this role in a psychiatric facility and another organization before my employment at MCH.

Moving on, this is only a synopsis of my experience that qualified me to apply for a promotion at MCH. I demonstrated my skills and abilities in the three units that I managed well. I also showed my dedication to MCH as I personally believe that God blessed me to work in this ministry and I was grateful. So, as a 44-year-old African American, when a new position was created, I applied for the promotion to Clinical Therapist. The hiring supervisors for this position were Dr. Pinney, a Licensed Psychologist, and Julie Spiech, an Associate Administrator. On September 8, 2015, in an email, I found out that Dr. Pinney and Julie Spiech discriminated against me by denying me this promotion. They promoted Austin Brown, a 32-year old Caucasian, who did not have experience working for a childcare organization before MCH. Mr. Brown had been working as a case manager in an MCH Outreach office since 2013. He received his professional license in August 2015, at the time that this new position was created. I was licensed in 1997. I was considerably more qualified and experienced than Mr. Brown for this promotion.

Nonetheless, after being discriminated against, I resumed my responsibilities with a positive attitude. I had been told by an African American female to "stay under the radar" if I wanted long term employment at MCH, so I remained quiet about this experience. The campus was not in a good place and was still affected by a popular young Hispanic resident, who after almost two years of saying that she was going to kill herself, did so in a unit on campus at MCH. This untimely loss of life allowed me to continue to show my support and exemplify my ability to make an impact on the campus and beyond my unit. Some of the residents who may have been involved in aiding this suicide were released from MCH or sent to other units. I was assigned a resident, who was close to this deceased resident, and who also had been transferred to several units, due to her challenging personality. I was able to assist her in the grief process and help restore her to a place of emotional health. One of the staff who found this resident deceased was moved to my unit also. I advocated for this staff who I professionally thought needed therapy based on my observation of her crying, saying that she could not sleep at night, discussing the resident who died by suicide, and recalling details of the incident. The birth date and death date of this resident was a hard time for some of the residents and staff. I advocated for my staff and resident as I thought that MCH was obligated to take care of them since they may have incurred trauma at MCH. Plus, MCH had the resources to do right by them. At this time when students needed high structure, high nurture, intense therapy, and emotional support, due to suicidal ideation, my staff and I were able to meet their needs. I again demonstrated my commitment to MCH by doing whatever was asked of me, putting in countless hours, and helping to stabilize the campus.

Likewise, I was readily available to work with a newly promoted Youth Care Counselor Supervisor (YCCS) who was officed in my unit. This YCCS was not assigned to me for supervision; but I offered to mentor this employee and did so. This YCCS and I worked closely together, and I would make advisements on how to problem shoot and ways to handle crises in other units on campus. I had experience supervising YCCS' in the first unit that I was assigned to at MCH thus I knew the proper way to train this employee. I was also a member of a Continuous Quality Improvement Committee from its inception. I was the only member that had been assigned to this committee from day one, who was asked to remain, and not rotate out of this committee, as others did. I obliged and never complained. My contributions on this committee was another opportunity for me to help make a positive impact on the campus. Every year in the fall, for several years, I was one a few employees, who were not in administrative positions, but allowed to attend a two-day administration conference with administrators from MCH. My supervisor at this time was Erica Reyes-Rosas, an Associate Administrator, who had only worked in childcare at MCH and who never managed a girls' structured unit. So, I cultivated a relationship with her to share my practice wisdom as I wanted her to be successful in her position as my boss. Helping her to be successful was helping MCH. She and I had a close working relationship and I have numerous texts from her complimenting me as a person and my work efforts. I volunteered myself to help a unit on campus that had special needs youth. I have text messages from Ms. Reyes-Rosas complimenting me on developing positive relationships with these students. It was approved for one of the residents in this unit to call me when he was upset. This was another manner in that I contributed to the needs at MCH. I purposely built connections with residents on campus for this reason and because I love working with adolescents. In February of 2018, I was called to the office of Erica Reyes-Rosas, where she and Taneequa Newton, another associate administrator, gifted me with a flower plant, for no specific occasion, but according to them, to show me their appreciation for my hard work. I was thankful.

Therefore, since my unit was going well, and I was receiving positive feedback on my efforts to help with the campus needs, I decided to apply for an Associate Administrator position that became available. I did so at the age of 47. I was discriminated against again so that Austin Brown could be promoted from a clinical position to an administrative position. I met the criteria in the MCH Promotion Policy and Mr. Brown did not. I complained to Human Resources because I could not understand how Mr. Brown could promote to an administrator from a non-supervisory position. I shared with Human Resources that I was told that Mr. Brown was saying that he was positioned for this promotion. An employee from Human Resources, Jean Wright, did not respond to this complaint in email. I even said in email that I was not aware of the promotion criteria because what was documented in the MCH Policies and Procedures Manual was not being followed. I copied the Human Resources Vice President, Judy Broadway in this email, and did not get a response from either HR employee. If the newly created Clinical Therapist position required supervision experience, Mr. Brown did not have supervisory experience working in a childcare organization, and I did.

In any case, Austin Brown was promoted to supervise Unit Managers and Youth Care Counselor Supervisors; review and approve budgets; prepare for licensing visits; health district inspections; review and approved unit manager documentation, handle resident and staff conflicts, family complaints; and more, all things he had never done before in a childcare organization and I had. In the email that I received from Erica Reyes-Rosas, on May 31, 2018, informing me that I did

not get this promotion, she wrote that both of my interviews for this position were "excellent." She made her decision to not promote me, in less than two weeks, after she brought the campus administration to my hospital room, without my knowledge or permission, the morning after I had surgery. I felt embarrassed by this experience. Per agency policy, and for FMLA leave, I had informed Ms. Reyes-Rosas of my surgery that was scheduled on the morning of May 21, 2018. I have a text from Ms. Reyes-Rosas asking how she could support me, and I said she could bring a plant by my home. I became suspicious that her seeing me in the hospital may have impacted her decision to not promote me, as well as, I did believe that I had been discriminated against again.

By promoting Mr. Brown, that meant that the Clinical Therapist position that I thought was now a supervisory position, per the report of Austin Brown, would be vacant again. I composed myself and followed protocol and informed my supervisor at the time, Taneequa Newton, that I had decided to reapply for the Clinical Therapist position. Ms. Newton responded in text that Ms. Reyes-Rosas had called me to inform me that the position of Clinical Therapist was posted. I had a missed call and voicemail from Ms. Reyes-Rosas. I contacted Jean Wright, an HR employee, by email to request that my application be sent to the hiring managers for the Clinical Therapist position. Ms. Wright responded to my email by stating, "for this position, you will need to follow the link below to apply online..." This was not the procedure that I had followed the other times that I applied for promotions. I asked Ms. Wright if the procedure had changed for internal applicants applying for promotions, and in her response email, she did not answer this specific question. After numerous emails and me reminding Ms. Wright that I had just undergone a major surgery, she would not forward my application to the hiring supervisors. It was only after I asked what my recourse would be if she did not forward my application that she agreed to do so. I wanted clarification that Ms. Wright would submit everything needed so that I would not miss out on this promotion opportunity. Emails were again sent back and forth between Ms. Wright and I, until Ms. Broadway, who had been copied in most of the emails, stated she would make sure that all information needed was sent to the hiring supervisors. I expressed in email to Ms. Wright and Ms. Broadway that I felt I was at an "disadvantage" because the MCH promotion criteria documented in the MCH Policies and Procedures Manual were not being followed, and whatever criteria was being used, were "ambiguous" to me. It seemed to me that I was going to be discriminated against again by the lack of concern and response that I got from Ms. Wright and Ms. Broadway.

Moreover, based on my experience thus far, and what I observed with another African American female employee at MCH, I decided to file a racial discrimination grievance. I had personally heard an African American female, Admissions Coordinator, talk about applying for a promotion to an advertised position, Director of Admissions. I witnessed the elimination of this position after I heard this woman state to me her intent to apply for this promotion. I watched this woman cry for days and I listened to her tell me her feelings and belief that she had been discriminated against. I provided support to her as she communicated to me what she was told by her supervisor in a discussion about her being promoted at MCH. What she communicated to me sounded like racial discrimination. After this, I saw a Caucasian employee, Julie Spiech, promote to a new position, Associate Administrator, and given the duties of the Director of Admissions. Remembering all of what I heard and saw happen to another African American, after being discriminated against twice so that the same younger and inexperienced Caucasian could be promoted twice, I became overwhelmed with emotion. I agonized over the decision to file a

racial discrimination grievance or not. The thought of doing so was frightening to me that at times I became immobilized by anxiety. I feared the retaliation of being terminated from my job that I absolutely loved. I feared losing my income, health coverage as I am diagnosed with a chronic illness, other employment benefits, and I thought about the damage that MCH could do to my reputation. The more I contemplated filing a racial discrimination grievance at MCH, my anxiety significantly increased to the point that I had a panic attack, loss consciousness, and fell. I went to the emergency room where I discovered I had a head injury, contusion, and fractured vertebrae. This is when and why I decided to move forward with filing the grievance. To have proof, if I was retaliated against, after filing the grievance on July 3, 2018, I did not speak to anyone in management at MCH in person, by phone or text. All communication was in email. I was on FMLA leave so my job was protected.

In email, on July 13, 2018, I found out that Dr. Pinney and Julie Spiech denied me a promotion for the second time. This made it the third time that I had been discriminated against in the promotion practices at MCH. They promoted Sarah Musick, who is Caucasian, and I believe was 34 years of age at the time. Sarah Musick had no supervisory experience in a childcare organization. I met all criteria in the MCH Promotion Policy, whereas Sarah Musick did not. I was significantly more qualified than Ms. Musick who was licensed in 2016. Furthermore, I believe that the actions by Julie Spiech were willful because on July 13, 2018, at 8:45 AM, she sent me an email. The email stated that she and Dr. Pinney chose another applicant for the Clinical Therapist position and wrote, “please feel free to contact me at your convenience.” So, I did. On July 13, at 10:57 AM, in email, I asked what criteria was used to make the promotion decision and Ms. Spiech never responded. Additionally, I allege that the actions of Dr. Elise Pinney were willful due to a multiple relationship I believe she had with Sarah Musick and Austin Brown. I assert the claim that Sarah Musick, and Austin Brown’s wife, Elizabeth Brown, may have been in association with Dr. Pinney, when they participated in a research project at Abilene Christian University. It is documented that during such research, “The Pinney Sexual Satisfaction Inventory” that Dr. Pinney helped to create was used. Thus, I claim that Dr. Pinney may have discriminated against me to hire associates who may have benefitted her personally by validating the inventory named above.

Additionally, I assert the claim that there is a culture of discrimination at MCH, and that this culture allows disparagement in the treatment of African Americans and Caucasians in the promotion practices and other administrative decisions made at MCH. I was harassed on social media, Messenger, by Michelle Petty, who is Caucasian and an MCH employee. She taunted me over not being able to regain employment at another childcare facility in Waco, Texas, due to a licensure issue that I had reported to Judy Broadway. This employee at MCH harassed me while having child pornography, as I allege, on her Facebook page. I reported this to Ms. Broadway along with a report that another Caucasian MCH employee has a post on her Facebook page that appears to be racist against our former African American President, Mr. Barak Obama. I provided evidence of my allegations, yet, both Caucasian females remain employed at MCH. On the other hand, two former African American employees were forced to resign, basically being terminated from their MCH employment, because of the language in a video posted on their Facebook page. This local rapper, who was an employee of MCH, at the time that he posted his video on his Facebook account, that is in his stage name, and not in his government name, was forced to resign. His Facebook page did not list MCH as his place of employment as Michelle

Petty and the other MCH employee. The other former African American employee who shared this same video was also forced to resign, basically terminated.

More disparagement is noted by the fact that I made a report to MCH administration, while I was an employee, concerning the actions of a Caucasian employee when she was on call and contacted by one of the staff that I supervised. My staff at the time, reported to this on call worker that a resident made a remark that may have indicated self-harm. The on-call employee came to MCH and asked for the student to come to her vehicle, where she remained inside with her two young kids. This quick and inadequate "suicide assessment" could have presented a harm to this resident. This Caucasian female remains employed at MCH. Yet, Judy Broadway reported to a Texas Workforce Commission Unemployment Insurance employee that I failed to keep a kid safe. To show that this statement was false, I made a report of Ms. Broadway's claim to DSHS. I did so because Ms. Broadway referenced a disabled kid in the termination email that she sent to me. I have a letter from a DSHS employee, Michelle Sullivan-Leal, that I believe is helpful in this matter.

Also, on August 22, 2019, I made a report to the Waco Police Department (WPD), Chief of Police, Mr. Ryan Holt, that on March 2, 2016, MCH made a false report to Detective Maria Bucher, Crimes Against Children, that a female resident in their care was sexually assaulted. In addition, a Criminal Defense Counsel, Mr. Thomas West, from Dunnam and Dunnam Law Firm, retracted a statement that suggested that I was involved in this report that MCH made to WPD, and I was not. This "kid" that Ms. Broadway stated that I failed to keep safe was unnamed, and no date was offered as to when this claim occurred. I did not know if Ms. Broadway was going to propagate this false report that is still being perpetuated by the McLennan County District Attorney's Office. I believed that she was going to do this, especially after the Methodist Children's Home Employment and Labor Attorneys, met with staff in the McLennan County District Attorney's office a few months ago, and that I believe was regarding this report. As this false statement has been misused, as I believe, I am now responding to a letter that I received from the Office of the Attorney General, reporting all of this, to help resolve this matter. Ms. Broadway also reported to TWC that my employment with MCH ended on April 30, 2018, and it did not. My employment with MCH ended on July 27, 2018. Someone from MCH made a false report to The Hartford saying that I had "salary continuation" during the time that I was out on FMLA leave, recovering from a major surgery, head injury, fractured vertebrae, high blood pressure, depression, anxiety, and receiving short term disability payments. This false statement made to The Hartford caused my disability payments to cease prematurely.

Finally, I believe the unlawful acts by multiple MCH employees against me were deliberate. It was only ten days after I filed grievances at MCH, opposing illegal behaviors, that I was discriminated against, again, in another promotion practice. I tried to resolve my grievances by going through Judy Broadway. Her response to me in several emails was for me to make a report to the Equal Employment Opportunity Commission or the Texas Workforce Commission Civil Rights Division, if I thought that I had been discriminated against. It did not appear that the goal by MCH was to resolve my grievance since the person tasked with investigating my grievance against her colleague and supervisor was telling me to file a charge outside of MCH. I did not want to do that. I wanted to remain employed at MCH and not be discriminated against. I must state that it was humiliating to me after I sent an email to the MCH Board of Directors, asking

for protection from retaliation at MCH, and found that my email had been rerouted to Mr. Tim
Brown, who was the MCH President at the time. I had reported in a grievance, that Mr. Brown
and an MCH Vice President, Mr. Moe Dozier, racially discriminated against a former resident
who was African American.

Moreover, the retaliation against me by MCH's upper management, highest paid, and
administrative employees was unbelievable. I felt devastated to be fired by a trusted MCH Board
Appointed employee who was assigned to investigate my grievance, Judy Broadway. I felt
attacked for exercising my protected rights and this induced negative thinking, feelings and
actions that have harmed me tremendously. While still employed at MCH, I followed MCH
Policies and I reached out to several MCH Board Members, who either did not respond or
provided no help to me. I felt so hurt and oppressed due to not being heard at MCH that I spoke
out on social media, Facebook. My Facebook account shows a side of me before and after I was
harmed by MCH. This is evidence of how the retaliation at MCH adversely affected me. I had a
couple of times where I thought that I needed inpatient treatment, but I relied on my faith to get
me through. This experience at MCH has changed my life forever. I am desperately seeking
justice for the violations of state and federal laws, the retaliation, and the physical, emotional,
and financial harm I endured. I pray that relief is provided so that the probability that actions like
this at MCH can be decreased.

Sheila D. Kendricks                    9-3-19
                                       Date

Exhibit B

**Sheila D. Kendricks, MSSW**

August 5, 2019

Submitted Via Electronic Transmission

Naman, Howell, Smith & Lee, PLLC
John T. Hawkins, Attorney at Law
400 Austin Avenue, Suite 800
Waco, Texas 76703

RE: Demand Letter

John Hawkins:

As legal counsel for the Methodist Children's Home located in Waco Texas at 1111 Herring Avenue, Waco, TX 76708, this demand letter is being sent to you. In order to resolve the EEOC Charge of Discrimination, EEOC Case Number: 31C-2019-00088, Sheila D. Kendricks v. Methodist Children's Home, a settlement offer is being extended to the Methodist Children's Home. To settle this matter, a payment amount of $500,000.00 would need to be rendered to Sheila Kendricks before the end of the business day on August 23, 2019. This settlement offer would resolve any and all legal matters between the Methodist Children's Home organization and myself, Sheila Kendricks, in the EEOC Case Number: 31C-2019-00088. This settlement offer would not resolve any legal matters against any MCH employees or board member named in the charge referenced above.

At MCH, during the time that I worked under the leadership of Ms. Reyes-Rosas, who is now the MCH Campus Administrator, I was assigned the female residents with the most difficult behaviors. I never complained and welcomed the challenge. I was also assigned most of the female residents coming from the psychiatric hospital to MCH. Again, I never complained and embraced the opportunities. My staff and I worked closely together and was able to avoid the development of a culture where residents used and sold illegal drugs; engaged in sex that resulted in the female resident becoming pregnant; was physically aggressive towards caregivers; and engaged in other high risks behaviors as occurred by MCH residents in other units. Before I filed grievances, I had never in my employment at MCH in eleven and a half years received any type of work discipline. In fact, I was given the MCH Core Value Service Award. Moe Dozier, the MCH Vice-President of Residential Programs, requested that I complete a "special project" and I gladly did. I was recommended for promotion in my evaluations. In February of 2018, I was called to Ms. Reyes-Rosas' office and presented with a flower plant for doing such a good job. I have many texts from Ms. Reyes-Rosas and other MCH employees, praising my work. In a text to me that I still have, Ms. Reyes-Rosas said that I "work miracles." To give a pertinent example, a female resident was assigned to the unit I managed. There was the propensity for this resident to engage in high risk behaviors. She never did in my unit. She was moved to another unit, that was under the leadership of Ms. Reyes-Rosas, and soon after, she was engaging in high risk behaviors. Therefore, she was moved back to my unit where she made good choices as indicated by her obtaining a job, opening a bank account, enrolling in driver's education, talking about going to college, etc. She was moved out of my unit again, into a different unit under the leadership of Ms. Reyes-Rosas. When I reached

out to check on this particular resident, after my employment termination from MCH, I was informed of her being allowed to remain at MCH while pregnant so that she could complete her junior year of high school. Now, she is a single mother without a high school diploma. My work at MCH allowed me to do what I absolutely loved doing, working in God's ministry serving others. Hence, I did want to promote to have a greater impact in God's ministry. I asked and have never been told the reason that I was never promoted. In an email from Ms. Reyes-Rosas saying that I did not get the Associate Administrator position, she stated that both my interviews were "excellent."

**Alleged Racial and/or Age Discrimination**

The Title VII of the Civil Rights Act of 1964, prevents discrimination against me because of my race and/or age. Yet, a retired MCH Administrator, Don Scott, reported that the former MCH President, Mr. Tim Brown, stated that African Americans, who Mr. Brown allegedly referred to as "niggers," would not promote under his leadership. It was under the leadership of Mr. Tim Brown that I applied for three promotions. I met all the promotion criteria in the MCH Promotion Policy. Being a 47-year-old African American female, with over twenty years of experience working with adolescents, I was denied all three of the promotions. Each promotion was given to younger Caucasians who had considerably less experience than me and who did not meet all the promotion criteria.

**Alleged Family and Medical Leave Act Violations**

The United States labor law allows me to have job protection during a medical leave of absence under the Family and Medical Leave Act of 1993. I was legally entitled to have up to twelve weeks of unpaid leave with job protection. I reported to Erica Reyes-Rosas, Waco Campus Administrator, my need to be off work to have a major surgery. My surgery was scheduled to occur on May 21, 2018. After notifying Ms. Reyes-Rosas of my leave request, I found out that I had been approved for FMLA leave on July 23, 2018, in email, by Ms. Judy Broadway, the MCH Vice-President of Human Resources. I had emailed Ms. Broadway, who copied Ms. Reyes-Rosas as I had done in my email to her, responded to my asking if I could delete work meeting dates from my cell phone. In this response email from Ms. Broadway, she stated that I was "still on FMLA" and she granted my request. Prior to this date, Ms. Broadway had made it very clear to me in email, that my employment was in jeopardy of being terminated since I was reaching out to the MCH Board of Directors, so this is the reason that I asked Ms. Broadway for this permission. As part of the FMLA leave process, I never received any information on my FMLA Rights and Responsibilities. It was on July 26, 2018, in email from Ms. Broadway, that I received a request for medical certification. I was fired from my job the very next day, before I could complete the form. I did not receive twelve weeks of job protected leave.

**Alleged Americans with Disabilities Act Violations**

The Americans with Disabilities Acts of 1990 prevents discrimination against me because of a disability and need for a reasonable accommodation. On July 9, 2018, I sent an email to Erica-Reyes-Rosas, and I copied to the email Ms. Broadway, Mr. Dozier, and Taneequa Newton, Associate Administrator. I stated in this email sent on July 9, 2018, that I was working with a medical assistant to develop reasonable accommodations for my return to work, and I specifically asked in this email, if there were any questions or concerns. Then, on July 17, 2018, I emailed Erica Reyes-Rosas; Mary Rollins, Human Resources Assistant; and Taneequa Newton and informed them of the accommodations that were set by my doctor, and I again specifically asked, if there were any questions or concerns. Next, on July 27, 2018 at 4:02 PM, I emailed Judy Broadway the documentation that I had acquired so far to satisfy the conditions of my return to work that I was told of on July 26, 2018, in email by Ms. Broadway. My employment with MCH was

ended by Judy Broadway, on July 27, 2018, in email at 4:28 PM. My accommodation request was to allow me to transition back to work over a period of eight weeks. This would have been accomplished by my working two hours a day for two weeks; then adding another two hours to make it four hours a day for two more weeks; then working six hours a day for two weeks; and then eight hours a day for two weeks before resuming my normal schedule of working over forty hours per week. Before my employment ended at MCH, my transition schedule, a reasonable accommodation, was approved by the Hartford Insurance Company after I worked with their staff and submitted all the required documentation.

**Alleged Retaliation for Opposing Unlawful Acts**

The United States Whistleblower Protection Program protects me from being retaliated against for reporting violations in my workplace. However, I alleged that I was retaliated against by Judy Broadway, Moe Dozier, and Erica Reyes-Rosas for filing a racial discrimination and a right to privacy violation grievance. It is important to note that I informed my supervisor, Erica Reyes-Rosas, that I needed to be on medical leave to have a major surgery. Without my knowing, the morning after my surgery, Ms. Reyes-Rosas brought all the campus administration to my hospital room. I felt humiliated and my right to recover in peace was violated. This alleged violation by Ms. Reyes-Rosas was submitted in a grievance on July 3, 2018, the same day that I opposed discrimination at MCH. Further, I allege that Ms. Broadway, Mr. Dozier and Ms. Reyes-Rosas retaliated against me by documenting false information in the employment termination email sent to me on July 27, 2018 by Ms. Broadway. First, in the termination email it was said that "I involved myself in some of the work activities in my department." Yet, I received no pay or benefits for the "work" activities that she referred to, and such work was not recorded on my timecard, nor reported to the Texas Workforce Commission to be factored into my unemployment benefits claim. Second, the former African American adolescent that was named in the racial discrimination grievance that I filed on July 3, 2018, alleging that she was racially discriminated against by Mr. Brown and Mr. Dozier, is the same adolescent referred to as a "young lady" in this next sentence. In the termination email, it was stated that I had to be told "at least twice that the appropriate people were dealing with this young lady and that I should not interfere with the process." However, before going on FMLA leave, at my request, I was authorized by Ms. Reyes-Rosas to assess this adolescent for readmission to MCH. This is the reason the adolescent reached out to me and asked for help. I asked Ms. Broadway in email if my employment would be terminated if I responded to this adolescent. As previously stated, I had been warned by Ms. Broadway that my job was in jeopardy, so I asked. Ms. Broadway forwarded my email to Mr. Dozier. I asked Mr. Dozier if someone would let this adolescent know that I was not ignoring her, but I was being restricted by him from responding to her. In email, Mr. Dozier said that I could not respond to her without being fired from my job; and, in the same email, Mr. Dozier said if she reached out to me again that I needed to refer her to Julie Spiech, the Associate Administrator over the Admissions Office. Trying to get clarification from Mr. Dozier, in email, did not appear possible, so I did not respond to this adolescent until my job from MCH was terminated. Per this adolescent's report, no one from MCH made any attempts to talk to her for the entire time that I was on FMLA leave. I believe this adolescent was discriminated against again by Mr. Dozier. Third, the last untruth made in email by Ms. Broadway was that I "raised an issue about a young man being properly served" and that I did not report the incident when I was "legally and morally obligated to report any problem." In email to Ms. Broadway, I made a recommendation for a legally blind disabled resident, based on current information and knowledge of high-risk behaviors by an MCH resident that was moved into the same unit as he. I did so out of a concern for safety and as required by my social work profession ethics. As a result of these false and untrue statements used to terminate my job from MCH, I was banned from campus, not allowed to pack my personal belongings, and denied the opportunity to say goodbye to my staff and residents after working for MCH for over eleven years. Finally, the last alleged act of retaliation was made by Ms. Broadway who gave the Texas

Exhibit B

Workforce Commission an inaccurate MCH employment end date for my unemployment benefits claim and reported a false statement that I failed to keep a kid safe to the TWC worker. Nonetheless, I received a letter from TWC with the determination by their office that I was not fired from MCH for work misconduct. I then reported this false statement that I did not keep a kid safe to the Texas Department of Health and Human Services. I received a letter dated August 24, 2018, from Michelle Sullivan-Leal, the Licensing Representative from the Texas Department of Health and Human Services who investigated my report. If I had failed to keep a kid safe, per the licensing standards that governs MCH's operation as a childcare organization, MCH would have been required to report such matter to the Texas Department of Health and Human Services. This false statement that I failed to keep a kid safe could not be confirmed.

**Summary**

Lastly, it must be noted that starting on Monday, May 21, 2018, until my employment termination date from MCH on Friday, July 27, 2018, I was off work on pain medications and under the care of several doctors. I was recovering from a major surgery, healing from a minor vertebrae fracture and head injury. I receive infusion treatments ongoing every six weeks for a chronic illness. Also, I was in therapy seeking help for anxiety and depression due to the fear that I would lose my job that would result in a loss of income, medical coverage, and other adverse consequences for exercising my protected rights. Although the law protects me from retaliation due to exercising my protected rights, after I filed grievances, the alleged retaliation described above created intense anxiety in me that manifested into panic attacks, severe depression, and chronic high blood pressure. In an email to Ms. Broadway dated July 13, 2018, I made Ms. Broadway aware of how "confusing, stressful, and harmful to my health and recovery" the grievance process at MCH had become. After receiving her response to this email, I again, on July 15, 2018, told Ms. Broadway in email that I was "tired, anxious, depressed and in physical and emotional pain." I went on to say in email that "I still have swelling on my forehead and pain on my head and face" and that this grievance process was "very stressful" to me. I never spoke to anyone from MCH administration and upper management in person, by phone or text messages after I filed grievances on July 3, 2018. All communication was in email purposely because I was scared that MCH upper management would do to me what had been done to others. If it happened to me, I wanted proof because I feared that no one would believe that upper management employees, working in a Christian ministry, would come together and engage in such egregious behaviors. This experience devastated me. As of today, I monitor my blood pressure throughout the day. I am prescribed the maximum dose of medications for anxiety and depression. Also, I am prescribed high doses of two high blood pressure medications and a moderate dose of a third high blood pressure medication. This traumatic experience has perpetuated thoughts and actions that I have only been able to cope with by my Christian faith and it has changed my life forever. Despite everything, MCH is unwilling to only verify my employment dates so that I can have a better chance at regaining employment. Having to put on employment applications, that after over twenty years of social work practice with youth, I was terminated from a childcare organization, significantly harms my employability. This MCH experience may have ended my career in working with adolescents.

**Settlement Negotiations**

Necessarily, I am willing to settle this matter if MCH chooses to accept this settlement offer. If MCH chooses not to accept this offer of settlement, I will respect the decision and proceed to the next step in seeking justice. Any and all communication in response to this demand letter must be made via email. I humbly ask that a designated board member is copied to all emails to and from Mr. Hawkins and myself throughout this process. I will accept the decision to do so or not. I only ask because of how the first mediation that occurred on March 25, 2019, to resolve this charge, was handled. I will not subject myself to any more mental anguish and emotional damage while seeking

justice from MCH. To compromise, I will forgo the pay difference of $5000.00 that was denied to me during the first alleged act of racial and/or age discrimination against me at MCH by Julie Spiech, Associate Administrator, and Elise Pinney, Licensed Psychologist who refused to promote me to the position of Clinical Therapist. This amount covers the time frame from September of 2015 to June of 2018. Please be informed that Ms. Spiech and Ms. Pinney allegedly engaged in the same act of racial and/or age discrimination against me when they again refused to promote me to the position of Clinical Therapist in July of 2018. Both times, I was the most qualified applicant, already working at the campus where the opening was, and denied the promotions. Instead, both times, a younger Caucasian caseworker from the MCH Abilene Outreach Office was given the position instead of me. Moving on, I will not ask for the monetary amount needed to make me whole again, and that is commensurate to the damage done to my career and physical and emotional health. MCH would be at risk for paying my attorney fees, private investigator fees, compensation for my medical and psychological providers professional testimonies, legal fees, court costs, etc. that I would ask for if this matter goes to court. There is also the risk of MCH having to pay punitive damages and higher amounts than I have offered in this settlement. In humility, I believe that I am favorable to win a lawsuit against MCH in court based on legal reviews of my case as I have evidence to support my claims to include emails, texts, and witnesses. My witnesses include individuals who also allege that they were discriminated against by MCH; former and current MCH residents; family members of former and current MCH residents; and former and current MCH staff. In addition, my witnesses are professional employees from other organizations that I collaborated with during the time of my MCH employment. Now, I will show how I reached the extended settlement offer of $500,000.00. Here is the breakdown of the $500,000.00 settlement offer: 1) $250,000.00 in economic damages, specifically for one year of back pay and two years of front pay at the Associate Administrator salary with medical compensation for all three years; 2) $150,000.00 for race, age, and/or disability discrimination, FMLA violations, and refusing to accommodate; 3) $50,000.00 for retaliation; and 4) $50,000.00 for emotional and physical pain and suffering.

**Closing**

Concluding, I attempted to work this matter out with Ms. Broadway so that we would not be here where we are now. I made several appeals to her advocating for residents, staff and myself. I only wanted a fair and due process from the investigation of my grievances by Ms. Broadway, who never informed me of the outcome of my grievances while I was employed at MCH. My efforts to work this matter out internally, while still being employed by MCH were futile. I reached out to Mr. Brown in email to discuss my grievances with him and he did not respond. I reached out to the Chairperson of the MCH Board of Directors, Mr. Hank Coleman, and he also did not respond. While still employed at MCH, I sent an email to the MCH Board of Directors and saw that my email was routed to Mr. Brown and two other MCH staff, all of whom did not respond. I did acquire evidence of the email being rerouted. So now, we are at this regrettable place because I want justice for what happened to me at MCH. I pray that my justice will prevent this from happening again to someone else. This is my hope. If you would, please send a formal letter, transmitted to me in email, of MCH's decision to accept or reject this settlement offer before the date listed at the beginning of this demand letter. I sincerely thank everyone who has a role in this settlement process. Again, thank you for your time and attention to this matter.

Sincerely,

*Sheila D. Kendricks*

Sheila D. Kendricks

Exhibit C

# Re: Demand Letter for the Methodist Children's Home

From: John Hawkins (Hawkins@namanhowell.com)

To: sheila_kendricks@yahoo.com

Date: Monday, August 5, 2019, 07:21 AM PDT

I have received your letter. We will consider a response and get back to you in at least a preliminary way by August 23.

cid:image001.png@0
1D265D3.407FFC40

**John T. Hawkins**
Naman, Howell, Smith & Lee, PLLC
400 Austin Avenue, Suite 800
P.O. Box 1470
Waco, Texas 76703
(254) 755-4100
Fax (254) 754-6331
hawkins@namanhowell.com

On Aug 5, 2019, at 7:00 AM, Sheila kendricks <sheila_kendricks@yahoo.com> wrote:

Begin forwarded message:

**From:** Sheila Kendricks <sheila_kendricks@yahoo.com>
**Date:** August 4, 2019 at 10:37:52 PM CDT
**To:** Sheila Kendricks <sheila_kendricks@yahoo.com>
**Subject:Demand Letter for the Methodist Children's Home**

John Hawkins: Please reply to this email acknowledging that you have received the demand letter sent from me, Sheila D. Kendricks, to the Methodist Children's Home, regarding the EEOC Charge of Discrimination (Case number 31C-2019-00088) that I have emailed to you on Monday, August 5, 2019 at 7 AM. Sheila D. Kendricks

<Demand Letter.docx>

Important/Confidential: This communication and any files or documents attached to it are intended only for the use of the person or entity to which it is addressed. It contains information that may be privileged,